T.C. Memo. 2008-45

UNITED STATES TAX COURT

CHARLES A. AND MARIAN L. DERBY, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 10930-02, 10931-02,    Filed February 28, 2008.
            10932-02, 10933-02,
            10934-02, 10935-02,
            10936-02, 10937-02,
            10939-02, 10941-02,
            10942-02, 10943-02,
            10945-02.

---

[1] Cases of the following petitioners are consolidated
herewith:  Peter E. and Geraldine Droubay, docket No. 10931-02;
James W. and Marilee G. Eusebio, docket No. 10932-02; Michael R.
and Ann J. Harris, docket No. 10933-02; Michael A. and Linda S.
Hirsch, docket No. 10934-02; John F. Hoefer and Elise R. Smith-
Hoefer, docket No. 10935-02; Daniel J. and Sean C. Kennedy,
docket No. 10936-02; Harris D. and Barbara F. Levin, docket No.
10937-02; Gerald R. MacLean and Joan L. Smith-MacLean, docket No.
10939-02; Estate of Hugh A. Patterson, Deceased, Elizabeth K.
Patterson, Executrix, and Elizabeth K. Patterson, docket No.
10941-02; Robert S. Silva and Susan C. Silva, a.k.a. Susan K.
Silva, docket No. 10942-02; Women's Health Associates, Leon
Schimmel, Tax Matters Partner, docket No. 10943-02; and Richard
H. White and Paula A. Watts-White, docket No. 10945-02.

Steven J. Mopsick and Betty J. Williams, for petitioners.

Christian A. Speck and Kathryn K. Vetter, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, Judge:  Respondent determined deficiencies in petitioners' Federal income taxes for the 1994 taxable year as follows:

| Docket No. | Petitioner[1] | Deficiency |
|---|---|---|
| 10930-02 | Derby | $16,739 |
| 10931-02 | Droubay | 24,950 |
| 10932-02 | Eusebio | 14,237 |
| 10933-02 | Harris | 9,724 |
| 10934-02 | Hirsch | 8,008 |
| 10935-02 | Smith-Hoefer | 33,237 |
| 10936-02 | Kennedy | 13,917 |
| 10937-02 | Levin | 41,320 |
| 10939-02 | Smith-MacLean | 12,170 |
| 10941-02 | Patterson | 23,091 |
| 10942-02 | Silva | 26,976 |
| 10943-02 | Women's Health Assocs. | [2]162,926 |
| 10945-02 | Watts-White | 13,341 |

[1] Although petitioners filed joint returns, for convenience we use the surnames of the spouses whose medical practice transfers are at issue in these cases.

[2] Adjustment to the charitable contribution deduction claimed by the partnership.  The resulting deficiencies to the partners, Dr. Leon Schimmel and Dr. Carol Lynne Conrad-Forrest, are not at issue in these cases.

In his answers, respondent affirmatively alleges that the individual petitioners are liable for accuracy-related penalties for gross valuation misstatements equal to 40 percent of the

deficiencies pursuant to section 6662(a)[2] and (h).
Alternatively, respondent alleges that those petitioners are
liable for penalties for substantial valuation misstatements
equal to 20 percent of the deficiencies pursuant to section
6662(a), (b)(3), and (e)(1)(A).

The issues common to all petitioners are whether:  (1)
Petitioners are entitled to the charitable contribution
deductions claimed under section 170(a)(1) for the transfer to a
tax-exempt medical foundation of intangible assets associated
with each petitioner physician's medical practice, and (2) the
individual petitioners are liable for the 40-percent accuracy-
related penalty for gross valuation misstatements pursuant to
section 6662(a) and (h) or, alternatively, for the 20-percent
penalty for substantial valuation misstatements pursuant to
section 6662(a), (b)(3), and (e)(1)(A).[3]  In addition, the
following issues involve certain of petitioners as indicated,
whether:  (1) Petitioners Daniel J. and Jean C. Kennedy (the
Kennedys) underreported Dr. Kennedy's 1994 gross receipts by
$3,760 on Schedule C, Profit or Loss From Business, and (2)

---

[2] Unless otherwise noted, all section references are to the
Internal Revenue Code of 1986 as in effect for the year in issue,
and all Rule references are to the Tax Court Rules of Practice
and Procedure.

[3] The deficiencies also reflect adjustments that are
derivative of the principal adjustments, are not directly
disputed by petitioners, and will be resolved by our resolution
of the principal adjustments.  We do not further discuss those
derivative adjustments.

petitioners Charles A. and Marian L. Derby (the Derbys) underreported the 1994 income from Dr. Derby's S corporation by $3,665.

### FINDINGS OF FACT[4]

Some facts are stipulated and are so found. The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference.

I.  Petitioners

When they filed their petitions in these consolidated cases, petitioners Charles A. and Marian L. Derby, Peter E. and Geraldine Droubay, James W. and Marilee G. Eusebio, Michael A. and Linda S. Hirsch, John F. Hoefer and Elise R. Smith-Hoefer, Daniel J. and Sean C. Kennedy, Harris D. and Barbara F. Levin, Gerald R. MacLean and Joan L. Smith-MacLean, Hugh A. and Elizabeth K. Patterson, Robert S. and Susan C. Silva, and Richard H. White and Paula A. Watts-White, resided in California; petitioners Michael R. and Ann J. Harris resided in Oregon. During the taxable year ended December 31, 1994, Women's Health Associates (WHA) was a partnership as defined by section 6231(a)(1).  Its principal place of business was in California.

---

[4] To the extent that petitioners have failed to set forth objections to respondent's proposed findings of fact, or vice versa, we conclude that these proposed findings of fact are correct except to the extent that the nonobjecting party's proposed findings of fact are clearly inconsistent therewith. See Jonson v. Commissioner, 118 T.C. 106, 108 n.4 (2002), affd. 353 F.3d 1181 (10th Cir. 2003).

WHA had two partners, Drs. Leon Schimmel (Dr. Schimmel) and Carol Lynne Conrad-Forrest (Dr. Conrad-Forrest), both of whom practiced obstetrics/gynecology. Dr. Schimmel was the tax matters partner of WHA. At the time the petition for WHA was filed, Dr. Schimmel resided in California.

Petitioners were primary care physicians[5] (with three exceptions: an orthopedic surgeon, an otolaryngologist, and a psychiatrist) that had been practicing in individual and small group practices (as sole proprietorships, S corporation shareholders, or partners) in the Davis, California, area for periods ranging from 1 to 21 years in 1994.

II. Background

A. Healthcare Industry

Through the early 1980s, medicine was generally practiced in the Davis, California, area under a "fee-for-service" model, in which physicians were paid fees when services were provided to patients. Patients with health insurance paid fixed premiums to a health insurer, and the insurer would in turn contract directly with physicians to establish a fee schedule for services provided to its insureds. Though collecting premiums, the insurer paid

---

[5] Each individual petitioner physician filed a joint return with his or her spouse, and the spouses are petitioners in these cases by virtue of having filed joint returns. We shall refer to the individual petitioner physicians as "petitioners". For convenience, we shall also generally refer to the two partners of WHA, Dr. Schimmel and Dr. Conrad-Forrest, as petitioners.

the physicians only when its insureds received medical services. Consequently, the insurer bore the risk that a given patient would require medical care costing more than the premiums that patient had paid.

In the fee-for-service environment, many doctors, including petitioners, owned their own practices (alone or with partners) and managed them independently, including hiring support staff, purchasing equipment, and overseeing billing and collection.

In the mid-1980s, the phenomenon of managed care, in the form of health maintenance organizations (HMOs), began to take hold in the provision of medical services, especially in California. Under managed care, HMOs, a form of health insurer, would collect premiums from patients, but rather than pay physicians for services as rendered, HMOs would instead pay to a primary care physician a fixed monthly capitation fee to manage the care of each patient who selected that physician. Thus, under the HMO model of managed care, the risk of having a patient whose medical care costs exceeded the premiums paid was in general shifted from insurers to physicians and other health care providers.

The penetration of the HMO model was low at first, but it became much more prevalent over time. HMOs generally would not contract directly with individual physicians; instead, they would enter into agreements only with larger groups. Physicians in the

Davis area became aware in 1985 that the University of California at Davis (UC-Davis), the largest employer in the region, was considering offering HMO style coverage as a health insurance option for its employees. In response, a group of Davis area independent physicians, including several of petitioners, began to meet monthly to consider options for dealing with any significant penetration of the HMO model into the Davis area patient population.

B. Formation of IPA

One option for physicians desiring to serve patients with HMO coverage was membership in an independent practice association (IPA). An IPA is a collection of independent physicians formed (typically as a corporate entity) to serve as an intermediary between its member physicians and HMOs. IPAs negotiate contracts directly with HMOs, administer claims, collect capitation fees for the HMO patients who select a physician member, and pay over those fees to the physician members.

The penetration of the HMO model into the Davis area continued after 1985. In 1987, several of petitioners and other local doctors, principally primary care physicians, formed an IPA, the Davis Area Medical Group, Inc., later renamed United Health Medical Group, Inc. (UHMG).[6] UHMG negotiated contracts

---

[6] By 1994, each petitioner had become a member of UHMG,
(continued...)

with HMOs, collected capitation fees paid under those contracts, and distributed them to member physicians. UHMG contracted with a third-party administrator to perform the latter two functions for a fee of 15 percent of receipts. UHMG performed no other consolidated functions for its member physicians, such as other billing, patient record keeping, appointments, employment of staff, etc. Its member physicians continued to operate independent practices and to directly bill fee-for-service and preferred provider organization (PPO)[7] patients.

III.  Decision To Affiliate

    A.  Necessity of Affiliation

By approximately late 1992 or early 1993, several factors prompted petitioners to consider affiliating with a larger health care organization. The penetration of the HMO model into the Davis area had become substantial. The principal employer in the Davis area, UC-Davis, faced with burgeoning costs in providing conventional fee-for-service health insurance coverage, arranged to have HMOs among the health insurance options for its employees

---

    [6](...continued)
although UHMG's approximately 70 shareholder/members also included physicians who did not participate in the transactions at issue.

    [7] A PPO is an organization created by an insurer consisting of physicians and/or other health care providers who individually contract with the insurer to provide medical services to its insureds for reimbursement at a discount. The insureds have an incentive to use the insurer's "preferred providers" because the out-of-pocket costs of doing so are reduced.

starting in 1994. Because the out-of-pocket costs to the UC-Davis employees of HMO coverage were considerably less than fee-for-service coverage, petitioners believed UC-Davis's change would result in a substantial additional migration to HMOs in the area. In fact, a significant fee-for-service insurer, Blue Shield of California, faced with declining enrollments, dropped out of providing coverage to UC-Davis employees for 1994. This left only a few very expensive fee-for-service insurance options for UC-Davis employees; virtually all employees switched to HMO or other managed care coverage. By 1993, Sacramento, which is approximately 15 miles from Davis, had the highest penetration of HMO care in the United States.

In California, the shift towards managed care was accompanied by a significant consolidation of health care providers and insurers into larger organizations, or integrated delivery systems. Both HMOs and hospitals had begun to acquire physicians' practices as a means of expanding their patient base. Primary care physicians were attractive acquisition targets, given their patient rosters, especially organized groups of such physicians. The UHMG physicians, including petitioners, had in addition developed a reputation as especially cost-efficient practitioners; that is, they were perceived by insurers and others in the field as having shorter-than-average hospital

stays,[8] fewer-than-average Caesarian sections, etc. The UHMG physicians were therefore courted by several HMO and hospital organizations in the area as acquisition targets.

In petitioners' view, the IPA model, which they had adopted in forming UHMG, did not prove to be an especially effective means of preserving the economic viability of their medical practice in a managed care environment, where the risk of having sicker-than-average patients was shifted from insurers to health care providers. That was so because, while the IPA arrangement provided a mechanism whereby petitioners could treat patients with HMO coverage, the IPA arrangement did not create a capital pool, or result in sufficient size, to allow for the management, or effective spreading, of the foregoing new risk. Instead, petitioners believed, effective management of the risk would require that they affiliate with a larger organization. They also believed that such an affiliation would bring them greater leverage in negotiating capitation rates with HMOs and other insurers. A final impetus towards affiliation was the anticipation, by petitioners and other members of the medical community, that managed care would spread and consolidation of healthcare providers would increase as a result of a major effort

---

[8] UHMG physicians had pioneered the use of a "hospitalist", i.e., the full-time assignment of a physician from their group to a hospital to oversee the care of hospitalized patients of other UHMG physicians, rather than having each physician individually care for his or her hospitalized patients.

to restructure the provision of health care in the United States in 1994 by the Federal Government, including the creation of some form of national health insurance.

Against this backdrop, petitioners concluded that practicing medicine as independent or small group practitioners using an IPA would no longer be economically viable for them.  Instead, they decided, it would be advisable to affiliate with a larger health care organization such as an HMO or a hospital.  Affiliation with a larger organization provided a more secure means to practice medicine in a managed care environment, in petitioners' view, as it would provide them with a larger patient base for spreading the risk of loss being transferred to them by health insurers, greater capital resources for the same purpose, the benefits of greater bargaining leverage in negotiating managed care contracts, and greater efficiencies and economies of scale in providing care.

To facilitate the affiliation, it was also decided that certain of the UHMG member physicians, including petitioners, should form a medical group.[9]  Unlike an IPA, a medical group involved the consolidation of the member physicians' medical practices, so that patient revenues were pooled, expenses were shared, and salaries were paid to member physicians.  The newly

_____

[9] Not all members of the UHMG IPA were asked to join the new medical group, for various reasons, including that his or her medical specialty, or personality and/or practice style, was not perceived to be a good fit.

formed medical group would then affiliate with a larger organization seeking to acquire group practices. A "steering committee" of six UHMG physicians was formed for purposes of exploring an affiliation. Letters announcing the physicians' interest in forming a medical group and affiliating with a larger organization were sent to five potential acquirers: U.C.-Davis Medical Center, Foundation Health Corp., Woodland Clinic, Mercy Healthcare of Sacramento, and Sutter Health, all of which were seeking to acquire or affiliate with medical practices.

B. Rejection of Foundation Health Corp. Affiliation

The steering committee met and negotiated with representatives of the foregoing entities and recommended that the group affiliate with Foundation Health Corp. (Foundation). Foundation was an HMO operated for profit and publicly traded; it had embarked on a course of becoming a "Kaiser model" HMO; i.e., one that acquired medical practices as a means of expanding its patient base or "market share" in California. Foundation had offered what steering committee members believed was the most generous financial consideration, including substantial cash payments for the intangible assets, or goodwill, associated with the UHMG physicians' practices. Foundation considered the UHMG physicians more valuable to it as a medical group (rather than individual practices) because its experience had shown that existing working arrangements between physicians, such as call

schedules, reduced the management effort required of Foundation in organizing independent physicians to work together.

When the steering committee presented its recommendation (which had not been unanimous) to the group, it was soundly rejected. The remaining UHMG physicians, including several of petitioners, were vehemently opposed to any affiliation with Foundation. Most had had unpleasant experiences with Foundation's unwillingness to approve certain drugs and procedures they had recommended for patients. Foundation employed "formularies", which were approved lists of drugs the departure from which when prescribing for patients required substantial justification by the physician. This and other Foundation practices, which many of petitioners attributed to Foundation's for-profit, business-driven orientation, caused petitioners to fear a significant loss of professional autonomy were they to practice medicine as employees of Foundation.

IV.  Acquisition by Sutter Health

A.  Selection of Sutter Health

The discussions with Foundation were terminated, and after some consideration of the remaining potential acquirers, petitioners and the other UHMG doctors decided to pursue an affiliation with Sutter Health.[10]  Sutter Health was the parent

---

[10] Woodland Clinic had offered very little in the steering committee's view, as negotiations revealed that it was merely interested in the UHMG physicians' joining its organization

(continued...)

corporation of a regional health care system comprising a wide range of inpatient and outpatient clinics as well as acute care hospitals located in Northern California.  Sutter Health had a section 501(c)(3) subsidiary, Sutter Medical Foundation (SMF), that operated group medical practices that were integrated with Sutter Health's affiliated hospitals in an integrated delivery system.  SMF operated its group medical practices through professional service agreements with groups of local physicians. Sutter Health hoped to expand into the Davis area in 1994 by acquiring a local medical group to integrate with its hospitals in the area.  To accomplish this, Sutter Health envisioned having SMF purchase the assets of local physicians and enter into a professional services agreement with those physicians organized as a medical group.  Acquiring a physician group was important to Sutter Health, as it represented an immediate roster of patients for its clinics and acute care hospitals.[11]

Many of the UHMG physicians had privileges at the existing Sutter Health hospital in Davis and had been involved in the

---

[10](...continued)
individually.  Moreover, Woodland typically required physicians it employed to sign noncompete agreements, and petitioners were unwilling to agree to such restrictions.  The committee terminated  discussions with U.C.-Davis and Mercy Healthcare for reasons not fully disclosed in the record; at least one UHMG physician believed U.C.-Davis Medical Center was too large and "bureaucratic".

[11] SMF was not interested in contracting with physicians individually.

design of a new, state-of-the-art Sutter Davis Hospital scheduled to open in September 1994.

B. Negotiations

Negotiations between SMF and physician representatives of UHMG began in 1993 and continued through most of 1994. The discussions covering the consideration that petitioners would receive for their medical practices were protracted and sometimes acrimonious. Unlike Foundation, Sutter Health was unwilling to pay anything for the intangible assets, or goodwill, that might be associated with petitioners' medical practices. Sutter Health was unwilling to do so for two reasons: First, and principally, because Sutter Health's management believed that doing so might constitute a crime under the Medicare and Medicaid antikickback statute, 42 U.S.C. sec. 1320a-7b(b), prohibiting payments for referrals of patients eligible for Medicare or Medicaid;[12] and,

---

[12] Sutter Health's nonprofit, tax-exempt subsidiaries, including SMF, provided substantial goods and services for which payment was made under Medicare and Medicaid. The Associate General Counsel of the U.S. Department of Health and Human Services had written a letter on Dec. 22, 1992, in response to a request from the Internal Revenue Service Office of the Associate Chief Counsel for Employee Benefits and Exempt Organizations for the Department's views concerning the application of the Medicare and Medicaid antikickback statute, 42 U.S.C. sec. 1320a-7b(b), in the case of transactions involving the acquisition of physician practices by tax-exempt hospitals and other health care providers. The letter, widely circulated in the nonprofit health care sector, had expressed the view that payments made in connection with the acquisition of physician practices that were in excess of the fair market value of the "hard assets" of the practice, including payments for goodwill, patient lists, or patient records, might be considered payments for patient

(continued...)

second, because Sutter Health's management believed, on the basis of their projections of the financial performance of the UHMG physicians' group after acquisition, that any additional payment for intangibles would have rendered the deal financially nonviable for Sutter Health.  Sutter Health's management anticipated that petitioners and the other UHMG physicians could be persuaded to affiliate with Sutter Health through additional incentives, such as being given a management role, through participation in various management committees of SMF and Sutter Health.

Many of petitioners were greatly concerned that they not be required to sign any noncompete agreement in connection with their affiliation with a larger health care organization.  It was vitally important to them to be able to terminate their affiliation in the event they judged it unsatisfactory and resume the practice of medicine in the Davis, California, area without having to relocate.  Many were familiar with the tribulations of physicians in the area who had affiliated with the Woodland Clinic, which required affiliating physicians to sign noncompete agreements.  Petitioners were aware that when certain Woodland Clinic physicians sought to terminate their relationships with the clinic, they became embroiled in protracted litigation over

---

[12](...continued)
referrals in violation of the antikickback statute.  Violations of the statute could result in criminal penalties and/or exclusion from participation in Medicare and Medicaid programs.

the noncompete agreements.  Petitioners were determined to avoid that possibility.

At some point in the negotiations, petitioners and the other UHMG physicians decided to pursue exclusively an affiliation with Sutter Health.  Thereafter they retained an attorney, Peter Grant, to advise them with respect to the transaction with SMF.  Mr. Grant, whose fees were paid by SMF, was experienced in matters affecting health care organizations, including acquisitions of physician practices.  Mr. Grant recommended that, in light of Sutter Health's unwillingness to pay cash for goodwill or similar intangible assets associated with the physicians' practices, petitioners should consider donating their practice intangibles to SMF and claiming charitable contribution deductions for their values.

Mr. Grant recommended that petitioners structure the transfers of the intangibles as donations because that technique had been used in connection with an acquisition of a group medical practice by a nonprofit medical foundation (Friendly Hills Healthcare Foundation), for which Mr. Grant had served as an adviser.  Mr. Grant had received a written determination in the form of a determination letter granting section 501(c)(3) tax-exempt status to Friendly Hills Healthcare Foundation, where it had been represented that the medical group physicians would make donations of an aggregate portion of the transferred assets

(including intangible assets) to the foundation and claim charitable contribution deductions for proportionate amounts of the aggregate donation (Friendly Hills determination letter).  In addition, Mr. Grant was familiar with the annual Exempt Organizations Continuing Professional Education Technical Instruction Program manuals, including the manual for 1994, which expressly contemplated a "charitable donation" as one method by which a nonprofit corporation might acquire assets from an existing group medical practice in connection with its acquisition of the practice.[13]

    C.  <u>Acquisition Transaction</u>

    1.  <u>In General</u>

To effect Sutter Health's acquisition of the medical practices of the UHMG physicians, including petitioners, who wished to affiliate with it, a number of steps were taken, as discussed below.

First, Sutter Health and the affiliating physicians arranged for an appraisal of the "business enterprise value" of the to-be-formed medical group, as well as a separate appraisal of the tangible assets that would be transferred to SMF as part of the acquisition.  In April 1994, Sutter Health retained an investment banking firm, Houlihan Lokey Howard & Zukin (Houlihan), to

---

[13] See "Exempt Organizations Continuing Professional Education Technical Instruction Program for FY 1994", Dept. of Treasury, Internal Revenue Service, Training 4277-045, at 215-217 (7-93).

perform an analysis of the "Davis Medical Group * * * , a group medical practice (currently being formed) comprised of thirty-five primary care physicians" and to render an opinion regarding "the fair market value of the aggregate assets of * * * [the Davis Medical Group] exclusive of any benefit or element of value conferred upon Sutter [Health] as a consequence of its current or proposed relationship with * * * [Davis Medical Group], and with consideration of proposed posttransaction compensation and benefits to the physician group."  Houlihan also agreed to "allocate the appraised value of * * * [Davis Medical Group] to each of its physician/shareholders" using a method to be agreed upon in consultation with the UHMG steering committee, but the agreed-upon method "[had to] be acceptable" to Houlihan.  The retainer agreement further provided that Houlihan would arrange for an appraisal of the hard assets by a qualified third party, for a separate fee.

Second, shortly after Houlihan was retained, a corporation was formed to serve as the entity for the medical group to be formed by certain of the UHMG physicians, including petitioners, for purposes of the acquisition of their medical practices by SMF.  On April 19, 1994, the Community Health Associates Multispecialty Medical Group, Inc. (d.b.a. Sutter West Medical Group), was incorporated as a California professional medical corporation (SWMG).

2.  Professional Services Agreement (PSA)

SWMG thereupon entered into a Professional Services Agreement (PSA) with SMF on August 12, 1994, to become effective on November 1, 1994, subject to the conditions precedent that at least 25 primary care physicians associated with the UHMG IPA would become shareholder-employees of SWMG and sell their medical practices to SMF under prescribed asset purchase agreements.  The PSA had a 2-year term, subject to renewal.  Pursuant to the PSA, SWMG agreed to provide professional services through its member physicians exclusively to the patients of SMF's group practice program in a prescribed service area, generally the Davis, California, region, so as to become part of a comprehensive health care delivery system involving SMG, SWMG, and Sutter Health's hospitals and other health care facilities.  The physicians rendering the professional services on behalf of SWMG were to be under contract with SWMG pursuant to agreements complying with the terms of the PSA, which included the proviso that the physicians would provide professional services solely to SMF (through SWMG), with an exception for reasonable amounts of unpaid volunteer work.  SMF agreed to provide and maintain clinic locations and equipment, all necessary nonphysician personnel, professional liability insurance coverage, and accounting and billing services, as well as maintenance of patient records. Under the PSA, all patients seen by the SWMG shareholder

physicians were deemed to be the patients of SMF's group practice program, and all income from the rendering of professional services to these patients was to accrue to SMF.

The PSA contained a noncompete provision, under which SWMG and its physician shareholder/employees were prohibited from participating in the ownership, management, operation, or control of any business or person providing health care services within the service area covered by the agreement. However, specifically exempted from this prohibition was any SWMG physician who left the employment of SWMG.

Pursuant to the PSA, SWMG would receive compensation for its provision of professional services equal to a percentage of net[14] revenues from patients, as follows: 57.75 percent[15] of fee-for-service revenue; 47 to 53 percent of capitation revenue, depending on average monthly levels; and a sliding scale from 90

---

[14] For this purpose, "net" revenue consisted, in the case of fee-for-service revenues, of gross revenues less an estimated percentage to account for contractual discounts and bad debts and, in the case of capitation revenue, of gross revenue less amounts equal to the cost of third-party administration, cost of ancillary services, and other miscellaneous costs. "Net" revenues for this purpose were not offset by SMF's expenses of providing clinic locations, nonphysician personnel, or administrative services such as billing or maintaining patient records.

[15] The parties amended the PSA, wherein the fee-for-service percentage was initially set at 54.5 percent, to reflect the percentage noted above on Dec. 1, 1994, retroactive to Nov. 1, 1994.

to 60 percent for the first $800,000 of "risk pool revenue",[16] with a 55 percent[17] share of amounts above $800,000. SWMG agreed to compensate its physician members, including petitioners, from the foregoing share of revenues. In addition, the PSA provided a guaranty, or floor, on the annual compensation that SWMG (and through SWMG, its member physicians) would receive, generally equal to 98 percent of the total designated annual compensation amounts for SWMG's member physicians. (The designated annual compensation amounts were set individually for each member, and ranged (for full-time practitioners) from a high of $348,859 for petitioner Elise R. Smith-Hoefer to a low of $110,076 for petitioner James W. Eusebio.) Finally, the PSA provided for the payment of a "Physician Access Bonus" described as follows: "A critical element necessary to maintain an integrated health system is physician access. To provide an incentive to SWMG to form and sustain a group, SMF will pay SWMG a Physician Access Bonus." The PSA nowhere provided, or required that the employment agreement between SWMG and each SWMG physician provide, that SWMG physicians maintain "open" practices; i.e., accept new patients notwithstanding existing patient loads. Provisions governing the assignment of patients to SWMG

---

[16] The record does not define "risk pool revenue".

[17] As with capitation revenues, the share of risk pool revenues noted above was the product of a subsequent amendment, having been initially set at a flat 50 percent.

physicians were contained in the employment agreements between SWMG and each SWMG physician, discussed below.

The "Physician Access Bonus" was $35,000 for each of SWMG's full-time physicians, plus a prorated portion of $35,000 for each of up to five part-time physicians. Forty-four percent of the amount so calculated was payable 2.5 months after the November 1, 1994, effective date of the PSA (January 15, 1995), with the balance payable in two 28-percent installments on the first and second anniversaries of the PSA's effective date. When the PSA was renegotiated for the period after its initial 2-year term, there was no comparable provision for a "Physician Access Bonus". SMF did not pay physician access bonuses in connection with its acquisition of any other physician practices.

The PSA also secured for SWMG a role in the governance of SMF. Pursuant to the PSA, SWMG was entitled to designate one of its member physicians to serve as a voting member of SMF's board of directors during the first year of the agreement, and one to serve as a nonvoting member for the term of the agreement.[18] SWMG was also entitled to designate representatives on various management and planning committees of SMF and Sutter Health. In addition, as one of SMF's contracting medical groups, SWMG was entitled to nominate three of the seven members of SMF's Area

---

[18] SMF also agreed to "facilitate discussions" between SWMG and Sutter Health to evaluate and restructure provisions regarding permanent physician members of SMF's board of directors.

Governance Council, the function of which was to oversee the day-to-day operations of the group medical practices in SWMG's service area and to provide advice to SMF's board of directors with respect to all policy matters affecting that service area. Finally, SMF agreed under the PSA to include the SWMG member physicians' clinic locations among its clinic locations and to refrain from making changes in clinic locations during the term of the agreement without the approval of SWMG.

3. Physician Employment Agreements (PEAs) and Asset Purchase Agreements (APAs)

The concluding steps of the affiliation of the UHMG physicians with Sutter Health were effected during the latter half of October 1994 and consisted of the purchase of a share of SWMG's stock by each affiliating physician (including petitioners) coupled with his or her execution, effective November 1, 1994, of a Physician Employment Agreement (PEA) with SWMG and an Asset Purchase Agreement (APA) with SMF. SMF's obligation to purchase, and each affiliating physician's obligation to sell, his or her medical practice pursuant to an APA was preconditioned upon the physician's having become a shareholder and employee of SWMG, and the PSA between SWMG and SMF having become effective.

As noted, a precondition to the PSA's becoming effective was the requirement that at least 25 of the UHMG physicians become shareholders of SWMG. This had occurred by the end of October

1994, by which time 36 UHMG physicians had done so.  Accordingly, the SWMG shareholder physicians sold their practices pursuant to the APAs and became employees of SWMG pursuant to the PEAs, on November 1, 1994.

The PEAs between SWMG and the affiliating physicians, including petitioners, were substantially identical except for the compensation and benefit amounts to be paid to the physicians under the agreements, and were effective November 1, 1994, for a term of 1 year, renewable annually.  Each petitioner agreed to practice medicine full time and exclusively for SWMG (except for reasonable amounts of unpaid volunteer work) and to provide medical services solely to SMF and its group practice patients. SWMG was given "the exclusive right to allocate patients among its employees with due regard to the source of the patients, the patient's preference with respect to choice of physicians, the specialty and skills of its employees, and their workload"; however, SMF was given "final authority over acceptance or refusal of any patient".  The PEAs provided that persons treated by physicians pursuant to the agreement were patients of SMF and that SMF was solely entitled to all fees for the services rendered by the physicians.  Upon the termination of a physician's employment under the PEA, the physician was not entitled to take or use any confidential or proprietary

information of SWMG, including "patient lists" and "patient medical records".  The PEAs provided in addition that

> the Physician shall not use any information obtained in the course of his or her employment with * * * [SWMG] for the purpose of notifying patients of * * * [SWMG] of the termination of his or her employment, or of his or her willingness to provide medical services; provided, however, the departing Physician may give written notice to the Departing Physician's patients named in the Departing Physician's patient list furnished to SMF on or before the [November 1, 1994] Effective Date [of the PEA], announcing the Departing Physician's separation from  * * * SWMG and his or her new practice location, and offering the patient an opportunity to choose whether his or her patient records should remain with SMF or be transferred to the Departing Physician.

We shall hereinafter refer to the foregoing patient notification right, together with the PSA's exemption from its noncompete provision for SWMG physicians who ceased employment with SWMG, as the free-to-compete provision.

Each affiliating UHMG physician (or partnership), including petitioners, agreed to sell his/her (or its) medical practice assets to SMF pursuant to an APA.  Although each seller entered into a separate APA with SMF, the APAs were virtually identical.[19] Pursuant to article 1 of those agreements, SMF agreed to purchase from each seller "all of the fixtures and personal property of every kind and description, whether tangible or intangible and wherever located, * * * used in the operation of [the seller's] business."  Those assets included the seller's fixed assets

---

[19] The APAs were prepared from master agreements that were customized for each seller.

(equipment, furniture, fixtures), inventory and supplies, records (excluding patient records), licenses and permits to the extent transferrable under applicable law, and any intangibles which were part of the seller's medical practice. Each seller retained his/her (or its) cash and accounts receivable. Each seller was given "an equal and joint ownership interest" with SMF "in all patient lists and patient medical records used in [the seller's business]". SMF agreed to assume contractual and lease liabilities.

Article 1.04 of each APA provided:

Seller and Buyer believe that the purchase price of the Assets is less than their fair market value. The difference between the purchase price and the fair market value of the Assets is referred to as the "contribution". At the closing, Seller will irrevocably and unconditionally donate the Contribution to Buyer to be used in furtherance of its charitable purposes. If Seller chooses to claim a charitable contribution deduction for the Contribution, then, subject to the following conditions, Buyer, upon the written request of Seller, agrees to acknowledge receipt of the contributed property by executing Part IV (Donee Acknowledgment) of a properly completed IRS Form 8283 (Noncash Charitable Contribution) supplied by Seller: (a) Seller must obtain from a duly qualified independent third-party appraiser an appraisal (the "Appraisal") of the value of the Seller's Business that complies with the standards of Rev. Rul. 59-60, including its later modification and amplifications; (b) the Appraisal must be made as of a date no more than sixty (60) days prior to the Closing Date (as defined in Section 7.01); (c) the claimed fair market value of Seller's charitable contribution must not exceed the Contribution, as determined by the Appraisal.

The APA further provided that each seller was required "to use Seller's best efforts * * * to preserve Seller's present business relationship with suppliers, patients and others having business relationships with Seller" and "to cooperate with * * * [SMF's] attempts to retain the services of the employees of Seller's Business following the Closing to the extent that * * * [SMF] decides to attempt to employ any such employees."

### 4. Houlihan and Narvco Appraisals

Houlihan issued its appraisal (Houlihan appraisal) on April 7, 1995.[20] The Houlihan appraisal described SWMG as "a newly formed group of thirty-eight physicians who have practiced in the City of Davis for many years." Using a discounted cashflow approach, the Houlihan appraisal concluded that, "as of November 1, 1994 and currently, the fair market value of the fixed and intangible assets, excluding working capital, of * * * [SWMG] is reasonably stated as $4 million."

The tangible assets of the affiliating physicians' practices were valued separately by Narvco Enterprises, Inc. (Narvco). The standard used by Narvco in valuing the tangible assets, namely, "value in use", was directed by SMF and the SWMG physicians after they had agreed that it was appropriate. Under the APAs, each

---

[20] Respondent contends, and we agree, that the Houlihan appraisal is hearsay. It was not offered as an expert report under Rule 143(f). Nonetheless, it was the appraisal relied on by petitioners in the 1994 returns, and it is relevant for various nonhearsay purposes.

SWMG physician received payment for the tangible assets of his or her medical practice equal to the appraised value determined by Narvco. The aggregate amount paid by SMF for the tangible assets of the SWMG physicians' practices was $1,156,733.

### 5. Allocation of Value of Intangibles

SWMG entered into a further retainer agreement with Houlihan on June 14, 1995, pursuant to which Houlihan would provide an opinion "with respect to the appropriateness of the allocation of the intangible value [of SWMG] among the individual shareholders of SWMG pursuant to * * * the Asset Purchase Agreement [APA] between SWMG and Sutter Health." No such opinion is in the record. Earlier, in an October 11, 1994, letter, Houlihan had advised Dr. Silva (chairman of the SWMG steering committee) that an allocation could be made upon one, or a combination, of the following three methods: On the basis of each physician's contribution to revenue, on the basis of each physician's contribution to income, or on the basis of each physician's roster of active patients.

The formula for allocating each SWMG physician's proportionate share of the estimated intangible value of SWMG was devised, however, not by Houlihan but by one of petitioners; namely, Dr. Levin. Dr. Levin described his allocation, to be used by each SWMG physician for purposes of calculating his or her charitable contribution deduction arising from the "bargain

sale" of his or her medical practice to SMF, in a July 11, 1995, letter. Dr. Levin calculated that the aggregate value of the intangible assets that had been "contributed" by the SWMG physicians to SMF was equal to the "business enterprise valuation" of SWMG as determined by Houlihan ($4 million), less the aggregate value of the amount paid by SMF to the SWMG physicians for the fixed assets of their practices, as determined by Narvco ($1,156,733), less the aggregate accounts receivable estimated to be collectible by the SWMG physicians as of November 1, 1994 (the transfer date) ($1,210,890). The residual ($1,632,377) was assumed to represent "the value of the intangible donation to * * * [SMF]." This aggregate value was then allocated among the 29 SWMG physicians who sold their medical practices to SMF, pursuant to a formula devised by Dr. Levin. That formula allocated (i) 50 percent of the aggregate value on the basis of each physician's share of gross revenues generated in the year preceding the transfer to SMF; (ii) 25 percent on the basis of each physician's "years in the community", with up to a maximum of 5 years being counted; and (iii) 25 percent on the basis of each physician's share of the aggregate fixed assets transferred to SMF by the SWMG physicians.

V.  Petitioners' and SMF's 1994 Returns

On their 1994 returns, petitioners claimed charitable contribution deductions for the transfer to SMF of the intangible

assets associated with their medical practices in amounts consistent with Dr. Levin's allocations, as follows:

| Docket No. | Petitioner | Deduction Claimed |
|---|---|---|
| 10930-02 | Derby | [1]$65,006 |
| 10931-02 | Droubay | 73,592 |
| 10932-02 | Eusebio | 35,978 |
| 10933-02 | Harris | 38,839 |
| 10934-02 | Hirsch | 28,619 |
| 10935-02 | Smith-Hoefer | 81,769 |
| 10936-02 | Kennedy | [2]40,884 |
| 10937-02 | Levin | 104,255 |
| 10939-02 | Smith-MacLean | 47,427 |
| 10941-02 | Patterson | 83,405 |
| 10942-02 | Silva | 76,045 |
| 10943-02 | Women's Health Assoc. | [3]162,926 |
| 10945-02 | Watts-White | 40,475 |

[1] Because the charitable contribution deduction claimed on Schedule A, Itemized Deductions, of the Derbys' 1994 return ($8,913 in cash contributions plus the $65,006 noncash portion at issue in this case) exceeded 50 percent of adjusted gross income, the Derbys' 1994 charitable contribution deduction was limited to $60,212.  Respondent denied a deduction for "any amount in excess of $8913" and increased the Derbys' income by $51,409, although it appears that the deduction disallowance should not have exceeded $51,299 (the difference between $60,212 and $8,913).

[2] Claimed on an amended return.

[3] This is the aggregate amount of the charitable contribution deduction related to the SMF transaction that the partnership allocated to the two partners (Dr. Schimmel ($77,277); and Dr. Conrad-Forest ($85,699)) on the partnership return.  The Forms 8283 provided for each partner list a charitable contribution deduction of $96,896 for each.  There is no evidence in the record that accounts for the discrepancy.

Attached to each petitioner's 1994 return was a Form 8283, Noncash Charitable Contributions, in support of the charitable contribution deduction claimed for the transfer of intangible assets to SMF. Part III, Certification of Appraiser, of Section B of the Form 8283 was executed by Houlihan and dated April 7, 1995, the date of the Houlihan appraisal. Part IV, Donee Acknowledgment, of Section B of the Form 8283 was executed on behalf of SMF by Karl Silberstein, "VP", and dated July 18, 1995.

On its 1994 return, Form 990, Return of Organization Exempt From Income Tax, SMF did not report as contributions received any donations of intangible assets or goodwill from petitioners or any other SWMG physician.

VI. Dutcher Appraisal

After respondent commenced an examination of petitioners' 1994 returns, petitioners' counsel in this case retained another appraiser, Ernest E. Dutcher, managing member of National Business Appraisers, L.L.C., to "independently determine the market value of the intangible assets of SWMG as of * * * November 1, 1994, assuming a sale to a qualified buyer who could either be a for-profit entity or a 501(c)(3) corporation." Mr. Dutcher's appraisal (Dutcher appraisal) postulated that the value of the aggregate intangibles of the SWMG physicians was equal to

SWMG's "business enterprise value" less SWMG's (i)"implied working capital" and (ii) fixed assets.[21]

Mr. Dutcher derived the business enterprise value of SWMG by taking the weighted average of what he computed to be SWMG's value based on an income method (50 percent), an asset method (40 percent), and a market method (10 percent). The income value was based upon a discounted future distributable earnings approach whereby an estimate of SWMG physicians' aggregate revenues for 1994[22] was projected forward, and the future after-tax distributable earnings then discounted to present value, producing a business enterprise value on November 1, 1994, of $4,112,500. In calculating what SWMG's future distributable earnings would be, Mr. Dutcher assumed that the expense of physician compensation would equal the national median for the

---

[21] The Dutcher appraisal treated the fixed assets of SWMG as equal to the fixed assets of the medical practices of each of the SWMG physicians (or partnership) who transferred his or her (or its) practice to SMF.

[22] SWMG did not exist as an operating entity until Nov. 1, 1994. Mr. Dutcher treated as SWMG's 1994 revenues the estimated 1994 aggregate revenues of the 29 UHMG physicians who transferred their practices to SMF, plus the 1994 revenues of 5 of the 7 "hired" physicians in SWMG who did not have ownership interests in a medical practice when the affiliation with SMF consummated.

"Western Region"[23] for a weighted average of the medical specialties comprising SWMG, or 45.18 percent.

The asset value was based upon a capitalization of excess earnings approach. In making his computations under the excess earnings approach, Mr. Dutcher used the Narvco appraised value of the tangible assets of the medical practices of the UHMG physicians who transferred their practices to SMG (namely, $1,156,733), as the value of SWMG's fixed assets. Mr. Dutcher's estimate of the business enterprise value of SWMG computed under the excess earnings approach was $4,061,400.

Finally, Mr. Dutcher used a market approach whereby he derived a business enterprise value for SWMG based on a comparison with price/earnings ratios of publicly traded health care companies, with a 23.1-percent discount for SWMG's smaller size, a 35-percent premium reflecting control, and a discount for lack of marketability of 10 percent, resulting in an indicated value of $4,076,400. Weighting the three values in the manner previously noted produced a business enterprise value of $4,088,450.

As noted, Mr. Dutcher treated the value of SWMG's intangible assets as SWMG's business enterprise value ($4,088,450), less (i)

---

[23] Mr. Dutcher's figures were taken from a "Physician Compensation Survey", based on data from a report by the Center for Research in Ambulatory Health Care Administration, "Physician Compensation and Production Survey: 1994 Report Based on 1993 Data".

"implied working capital" (estimated as 4 percent of net revenue, in accordance with industry standards, or $416,462[24]) and (ii) fixed assets (Narvco's $1,156,733 appraised value), producing an estimated value for SWMG's intangible assets of $2,515,255. Mr. Dutcher further opined that SWMG's intangible value represented a "bundle" of intangible assets, including "assembled workforce, patient records, provider contracts, trademarks and tradename, and practice goodwill".[25]

For purpose of allocating the $2,515,255 value for SWMG's intangible assets to the 29 SWMG physicians, Mr. Dutcher simply adopted the same formula devised by Dr. Levin. The Dutcher appraisal offered no analysis of the appropriateness of Dr. Levin's formula.

The business enterprise value of SWMG as estimated in the Houlihan and Dutcher appraisals differed by only 2 percent

---

[24] In Mr. Dutcher's view, substituting an amount for "implied working capital", based on industry standards, instead of measuring actual current assets and liabilities, provided a more accurate measure of the business enterprise value of a going concern, since the level of current assets and liabilities fluctuates greatly.

[25] In Mr. Dutcher's view, the goodwill of a medical or other professional practice consists of "practice goodwill", which is associated with the entity, and "professional goodwill", which is associated with the individual. According to Mr. Dutcher, the practice goodwill of a medical practice generally consists of such items of value as patient records, provider contracts, assembled workforce, trademarks and tradenames, and going concern value. Professional goodwill, in his view, "results from the charisma, knowledge, skill, and reputation of a specific practitioner", is not transferable, and has no economic value.

($4,000,000 and $4,088,450, respectively). However, the aggregate value of SWMG's intangible assets estimated by the Dutcher appraisal ($2,515,255) differed markedly from the amount postulated by Dr. Levin through the use of his formula ($1,632,377). Since the Dutcher appraisal and Dr. Levin's formula both started with substantially the same figure for SWMG's business enterprise value, and both subtracted an identical figure for fixed assets ($1,156,733), the marked difference in their outcomes is attributable to the fact that Dr. Levin believed that the SWMG physicians' accounts receivable ($1,210,890 as of November 1, 1994) also needed to be subtracted (and that no adjustment needed to be made for working capital), whereas the Dutcher appraisal postulated that all current assets and liabilities (i.e., including accounts receivable) were best accounted for by subtracting an amount for implied working capital, which was estimated as $416,462. The difference between the Dutcher appraisal's working capital figure and Dr. Levin's accounts receivable figure, when added to the approximately 2-percent difference in the Dutcher and Houlihan estimates of SWMG's business enterprise value, accounts for the discrepancy in the estimates of SWMG's aggregate intangible value by Dr. Levin and the Dutcher appraisal.

In his appraisal, Mr. Dutcher also asserted that "it is my opinion the physician compensation offered SWMG shareholders by

Sutter had no market value beyond the value of their professional medical services".  The Dutcher appraisal contains no further discussion or analysis purporting to support this proposition. The Dutcher appraisal does, however, contain a "Physician Compensation Survey", which sets forth the national median ratios (for the "Western Region") of physician compensation to net revenues for listed medical specialties.  Using a weighted average of those published ratios, the Dutcher appraisal's Physician Compensation Survey shows that the weighted average of the national median ratios of "compensation to revenue" for the specialties mix of the SWMG physicians was 45.18 percent.  As previously noted, the PSA entered into between SWMG and SMF provided for compensation to SWMG equal to 57.75 percent of fee-for-service revenue, 47 to 53 percent of capitation revenue, and at least 55 percent of risk pool revenue.

VII.  Issues Related to Specific Petitioners

A.  The Kennedys

On Schedule C of the Kennedys' 1994 return, they reported $195,709 of gross receipts from Dr. Kennedy's medical practice. The notice of deficiency issued to the Kennedys increased reported Schedule C gross receipts by $3,760 to $199,469.

B.  The Derbys

On Schedule E, Supplemental Income and Loss, Part II, Income or Loss From Partnerships and S Corporations, of the Derbys' 1994

return, they reported $4,209 of nonpassive income from Schedule K-1, Shareholder's Share of Income, Credits, Deductions, etc., attached to the 1994 Form 1120S, U.S. Income Tax Return for an S Corporation, filed by Dr. Derby's wholly owned professional corporation, Charles A. Derby, M.D., Inc. The referenced Schedule K-1 states that Dr. Derby's share of his S corporation's 1994 ordinary income from business activities was $7,874. The notice of deficiency issued to the Derbys increased their 1994 income by $3,665, the difference between the foregoing figures on the Schedules K-1 and E.

## OPINION

### I. Petitioners' Entitlement to Charitable Contribution Deductions for Their Transfers of Intangible Assets to SMF

#### A. Transfer Without Adequate Consideration

Petitioners contend that as part of the transfer of their medical practices to SMF they each made a charitable contribution to that entity of the intangible assets of the practices. Respondent determined that the deductions petitioners claimed on account of the charitable contributions are not allowable, and we must decide the extent, if any, to which they may be deducted. Petitioners bear the burden of proving their entitlement to those deductions. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Deputy v. Du Pont, 308 U.S. 488, 493 (1940); New Colonial

Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); see also Rule
142(a)(1).[26]

Section 170(a) generally allows a taxpayer a deduction for
any charitable contribution, as defined in section 170(c), made
during the taxable year.  Section 170(c) defines the term
"charitable contribution" as "a contribution or gift" to or for
the use of certain specified organizations.  Respondent has not
disputed that SMF was a qualified recipient of a charitable
contribution as required by section 170(c).

If a charitable contribution is made in property other than
money, the amount of the contribution is generally the fair
market value of the property at the time of the contribution.
Sec. 1.170A-1(c)(1), Income Tax Regs.  "[F]air market value" for
this purpose "is the price at which the property would change
hands between a willing buyer and a willing seller, neither being
under any compulsion to buy or sell and both having reasonable
knowledge of relevant facts."  Sec. 1.170A-1(c)(2), Income Tax
Regs.  A charitable contribution is allowable as a deduction only
if verified under regulations prescribed by the Secretary, sec.
170(a)(1), including certain substantiation requirements provided
in section 1.170A-13(c)(2), Income Tax Regs.  In addition, no
deduction for any contribution in excess of $250 is allowed

_____

[26] Petitioners concede that sec. 7491(a) does not apply in
this proceeding.

unless the taxpayer substantiates it by a contemporaneous written acknowledgment by the donee organization.  Sec. 170(f)(8).

The question of what constitutes a "contribution or gift" for purposes of section 170 has been the subject of considerable caselaw.  Some 5 years before the transaction at issue in this case, the Supreme Court provided the following guidance:

> The legislative history of the "contribution or gift" limitation [of section 170], though sparse, reveals that Congress intended to differentiate between unrequited payments to qualified recipients and payments made to such recipients in return for goods or services.  Only the former were deemed deductible.  The House and Senate Reports on the 1954 tax bill, for example, both define "gifts" as payments "made with no expectation of a financial return commensurate with the amount of the gift."  * * * Using payments to hospitals as an example, both Reports state that the gift characterization should not apply to "a payment by an individual to a hospital in consideration of a binding obligation to provide medical treatment for the individual's employees.  It would apply only if there were no expectation of any quid pro quo from the hospital."  * * * [Hernandez v. Commissioner, 490 U.S. 680, 690 (1989); citations omitted.]

Thus, "A payment of money [or transfer of property] generally cannot constitute a charitable contribution if the contributor expects a substantial benefit in return."  United States v. Am. Bar Endowment, 477 U.S. 105, 116 (1986); see also Transamerica Corp. v. United States, 902 F.2d 1540, 1543 (Fed. Cir. 1990); Singer Co. v. United States, 196 Ct. Cl. 90, 449 F.2d 413 (1971) (sewing machine manufacturer not entitled to charitable contribution deduction for sale of sewing machines to public schools at discount, given the expectation that students' use

would result in future increases in sales); <u>Murphy v. Commissioner</u>, 54 T.C. 249, 254 (1970) (no charitable contribution deduction for payment to effect adoption of child).

The Supreme Court has further instructed that in ascertaining whether a given payment or property transfer was made with the expectation of any return benefit or quid pro quo, we are to examine the external, structural features of the transaction, which obviates the need for imprecise inquiries into the motivations of individual taxpayers. <u>Hernandez v. Commissioner</u>, <u>supra</u> at 690-691. In <u>Hernandez</u>, where the Supreme Court found a lack of donative intent in the taxpayers' payments to the Church of Scientology for certain "auditing" and training sessions, the external features cited by the Court included the church's establishment of fixed price schedules for the sessions, calibrated to length and level of sophistication; the provision of refunds if session services went unperformed; and the categorical prohibition on providing the sessions for free. These external features revealed the "inherently reciprocal nature of the exchange" involving the payments and the services provided by the church. A taxpayer who receives or expects to receive a benefit in return for a purported contribution may nonetheless be allowed a deduction if the money or property transferred clearly exceeds the benefit received and the excess is given with the intent to make a gift.

> Where the size of the payment is clearly out of
> proportion to the benefit received, it would not serve
> the purposes of §170 to deny a deduction altogether.  A
> taxpayer may therefore claim a deduction for the
> difference between a payment to a charitable
> organization and the market value of the benefit
> received in return, on the theory that the payment has
> the "dual character" of a purchase and a contribution.
> See, e.g., Rev. Rul. 67-246, 1967-2 Cum. Bull. 104
> (price of ticket to charity ball deductible to extent it
> exceeds market value of admission) * * * . [United
> States v. Am. Bar Endowment, supra at 117.]

A taxpayer claiming a charitable contribution deduction under the
"dual character" theory, however, "must at a minimum demonstrate
that he purposely contributed money or property in excess of the
value of any benefit he received in return."  Id. at 118; see also
Sklar v. Commissioner, 282 F.3d 610, 621-622 (9th Cir. 2002),
affg. T.C. Memo. 2000-118.

Petitioners argue that they transferred their medical
practices to SMF, a section 501(c)(3) organization, in a
transaction in which they agreed to accept a cash payment equal to
the value of the tangible assets of their respective practices and
no consideration for the intangible assets, because a payment for
goodwill would have violated Federal law.  Because they received
no consideration for the intangible assets, they made a
contribution thereof with the requisite donative intent,
petitioners contend.  In petitioners' view, the value of that
contribution is equal to each petitioner's allocable share of the
fair market value of the intangible assets of the medical group,
SWMG, formed when the transfers were made (as estimated by expert

appraisal).  The allocation to each petitioner of a share of the value of the intangible assets of the newly-formed medical group, though performed by a nonexpert (Dr. Levin, one of petitioners), was reasonable, petitioners argue, and was ratified by expert opinion.  In addition, petitioners argue, the Commissioner indicated in a determination letter and in certain training manuals that a charitable contribution deduction was available in similar circumstances for the transfer of medical practice intangible assets in connection with the acquisition of a group medical practice by a section 501(c)(3) organization. Consequently, petitioners contend, respondent has a duty of consistency with the foregoing in his litigating position in this case.

Respondent disputes all of petitioners' arguments. Respondent contends that petitioners have failed to show that the value of the assets they transferred to SMF, including any intangible assets of their medical practices, exceeded the values of the consideration each received in exchange therefor. Consequently, respondent argues, petitioners have failed to satisfy the test outlined in United States v. Am. Bar Endowment, supra.  Respondent further argues, relying on United States v. Am. Bar Endowment, supra, and Hernandez v. Commissioner, supra, that petitioners lacked donative intent in light of the substantial benefits that they expected to, and did in fact, receive in return

for the transfers of their medical practice intangibles.
Respondent also takes issue with numerous aspects of the valuation
of the intangible assets purportedly transferred by petitioners to
SMF.  Finally, respondent argues that petitioners have failed to
satisfy the substantiation requirements of section 1.170A-13,
Income Tax Regs., and section 170(f)(8).

We agree that petitioners have failed to satisfy the
requirements for a charitable contribution deduction.  While
petitioners seek to characterize the transaction between
themselves and SMF as the sale of the tangible assets of their
medical practices for cash equal to their value, coupled with the
transfer of their medical practice intangibles to SMF for no
consideration, that characterization ignores a significant
additional element of consideration they received; namely, future
employment with SMF on carefully delineated terms.  The agreements
securing the terms of petitioners' future employment (i.e., the
PSA between SWMG and SMF, and the PEAs between SWMG and each SWMG
physician) were integral to and legally interdependent with the
agreements under which petitioners transferred their medical
practice assets to SMF (i.e, the APAs).  Each of the foregoing
agreements was contingent upon the other.  Thus, the transfer of
petitioners' intangible assets to SMF was part of an integrated
transaction in which petitioners also agreed to provide future
services (through SWMG) and transfer tangible assets to SMF in

exchange for SMF's agreement to pay them cash and to employ them (through SWMG[27]) pursuant to specified terms.

The transaction had an "inherently reciprocal nature". Hernandez v. Commissioner, 490 U.S. at 692. The record demonstrates that Sutter Health clearly wanted the SWMG physicians' intangible assets, a significant portion of which consisted in their patient roster and the expectation of continued patronage from those patients.[28] Sutter was engaged in a strategy of expansion into the Davis area by means of acquiring existing medical practices to become part of an integrated delivery system with its hospitals. Sutter also had a nearly completed hospital in Davis for which it needed to ensure an adequate patient base. Another portion of petitioners' goodwill, their established reputation as efficient, cost-effective practitioners, increased their desirability to Sutter. The negotiations over the terms of the acquisition transactions were protracted and sometimes

---

[27] Under the integrated and legally interdependent agreements, petitioners were obligated to form SWMG and to enter into contracts to provide their medical services exclusively to SWMG under stated terms, and SMF was obligated to contract with SWMG for the medical services provided by petitioners and the other SWMG physicians. The obligation of SMF to purchase, and petitioners' obligation to sell, the tangible and intangible assets of their medical practices was contingent on the foregoing.

[28] We note that the PSA provided that once the transaction was consummated, all patients treated by the SWMG physicians were deemed to be the patients of SMF (subject to the physicians' rights to reclaim patients under the "free to compete" provision). In addition, the APA obligated the SWMG physicians to use their best efforts to retain existing patients.

acrimonious, according to the testimony of participants. It is clear from this testimony that the SWMG physicians negotiated aggressively for the best terms they could get. The intensity of the negotiations is reflected in the written agreements, which were amended late in the discussions to increase the percentages of net revenue that were to be paid to the SWMG physicians for given categories of revenue. Significantly, an official of SMF who participated in the negotiations testified that SMF not only "could not" pay anything for the SWMG physicians' intangibles but "would not", explaining that SMF's refusal to pay any cash for the intangibles was based both on the possible legal proscriptions and on SMF's unwillingness to pay anything for the intangibles because, according to SMF's financial projections, to do so would render the transaction financially infeasible for SMF. In sum, the SWMG physicians extracted from SMF all that SMF believed it could provide if the affiliation with the physicians were to remain economically viable.

The consideration received in the transaction by petitioners and the other SWMG physicians included: (1) Employment, with compensation to their medical group set at a minimum of 47 to 57.75 percent of net revenues with a guaranteed floor, (2) a $35,000 "Physician Access Bonus" for each physician, (3) rights to participate in the management of SMF; (4) greater professional autonomy than was perceived to be available from other potential

acquirers of their medical practices; and (5) rather than a noncompete agreement, the "free to compete" provision, which secured for each petitioner the express right, upon his or her termination of employment with SWMG/SMF, to have his or her patients as of the date of affiliation with SMF notified of the departure and given the option of having the patient's medical records transferred to the departing physician.  In addition, when petitioners' circumstances before the transaction are considered, a second tier of benefits they secured in the transaction with SMF becomes apparent.  First, petitioners solved their core economic problem arising from the advent of managed care; namely, the risk of loss from having patients requiring extraordinary care.  After the transaction, by virtue of the minimum compensation guaranties, this risk was largely transferred to SMF, which could better manage it given SMF's greater patient population and resources. Second, as a result of their affiliation with a relatively large health care organization, petitioners secured the benefits of greater leverage in negotiating contracts with HMO's and greater efficiencies in providing care, with any resulting enhancement in revenues inuring to their benefit by virtue of SWMG's compensation being determined as a percentage of net revenues.  In sum, by transferring their practices to SMF in the transaction at issue, petitioners ensured for themselves the continued ability to maintain or improve their accustomed level of earnings from the

practice of medicine-- something they had concluded was not likely to be possible had they continued to maintain solo or small group practices.

The linchpin of petitioners' claim of entitlement to a charitable contribution deduction is their argument that none of the foregoing consideration was received in exchange for the intangible assets of their medical practices, which consisted essentially of goodwill or going concern value. Petitioners contend that they received no consideration for their goodwill from SMF because any payment for goodwill by SMF was proscribed by law. Clearly none of the consideration from SMF was denominated as a direct payment for the intangible assets of petitioners' medical practices. However, given the integrated nature of the transaction, Sutter Health's desire to obtain petitioners' patient roster and other goodwill, and the intensity of the negotiations, we are persuaded that petitioners' intangible assets functioned as leverage in the negotiations and that their transfer to SMF resulted in an increase in the total consideration petitioners received in the transaction. Thus, the claim that petitioners received no consideration for their intangible assets is contradicted by the substantive evidence.[29]

---

[29] We are aware that the parties to the transaction went to some lengths in the APAs to memorialize that each SWMG physician as seller and SMF as buyer "believed" that the purchase price for the medical practice assets was less than their fair market value and that the seller was therefore donating to the buyer the

(continued...)

Since petitioners received consideration for their intangibles, their charitable contribution deductions fail unless they can show, pursuant to the theory approved in United States v. Am. Bar Endowment, 477 U.S. 105 (1986), that the transfer of their intangibles to SMF had a "dual character" as both a transfer for consideration[30] and a contribution. To do so, however, petitioners "must at a minimum demonstrate that * * * [they] purposely contributed money or property in excess of the value of any benefit * * * [they] received in return." Id. at 118; see also Sklar v. Commissioner, 282 F.3d at 620-622.

Petitioners have not shown that the value of what they transferred to SMF exceeded the value of the benefits they received in return. As noted above, those benefits included, in

---

[29](...continued)
excess of fair market value over the (purported) purchase price. In our view, this provision is a self-serving attempt to support the claim for a charitable deduction contribution. As discussed hereinafter, the SWMG physicians received many other kinds of consideration in connection with the integrated transaction. The effort in the APAs to allocate any consideration away from the intangible assets was self-serving for the SWMG physicians and a matter of indifference for SMF. Notably, notwithstanding the APAs' characterization of a contribution of intangible assets, SMF did not report the receipt of any such contributions on its Form 990 for 1994.

[30] United States v. Am. Bar Endowment, 477 U.S. 105 (1986), and the revenue ruling therein approved by the Supreme Court (Rev. Rul. 67-246, 1967-2 C.B. 104) both involved transfers of cash for goods or services that purportedly had dual characters as purchases and contributions. The same principle applies, however, to a transfer of property for consideration, see, e.g., Transamerica Corp. v. United States, 902 F.2d 1540, 1543-1546 (Fed. Cir. 1990), such as the transfer of the assets of petitioners' medical practices at issue.

the first instance, employment that was compensated with shares of

revenue (47 to 57.75 percent) that significantly exceeded the

median share of revenue (45.18 percent) devoted to physician

compensation in petitioners' specialties; a $35,000 "Physician

Access Bonus" for each SWMG physician, including petitioners;[31] an

absence of restrictions on establishing a competing medical

practice in the event of cessation of employment with SMF; and

greater economic security in the managed care environment.  Other

---

[31] Petitioners strenuously argue that the "Physician Access Bonuses" were consideration for the SWMG physicians' agreement to maintain "open" practices; i.e., to accept new patients notwithstanding existing patient loads.  Accordingly, petitioners contend, the "Physician Access Bonuses" could not have served as consideration for the SWMG physicians' transfer of their medical practice intangibles.

Petitioners' argument is unpersuasive.  As with petitioners' broader claim that no consideration was paid for their intangible assets, the argument depends upon segregating elements of consideration that were part of an integrated, and intensely negotiated, agreement.  The extensive and otherwise detailed written agreements governing the transaction with SMF do not mention any open practice requirement.  Even if the transaction documents had expressly allocated the $35,000 bonuses to the physicians' agreements to maintain open practices, we would remain unpersuaded, because there is no evidence in the record that a $35,000 payment was customary for a physician-employee's agreement to maintain an open practice.  In fact, one SMF official who testified conceded that no such bonuses had been paid to other physician groups that affiliated with SMF, and the Dutcher appraisal does not address the bonuses.  Tellingly, when the PSA was renegotiated to cover the period after its initial 2-year term, there was no comparable provision for "Physician Access Bonuses" to secure the SWMG physicians' open practice commitments.  After respondent noted this apparent inconsistency on brief, petitioners offered no explanation to account for it. Consequently, we find that the $35,000 "Physician Access Bonuses" are not fully allocable to open practice agreements and instead were part of the consideration package received by the SWMG physicians in exchange for the transfer of their medical practices.

benefits received included greater professional autonomy than was perceived to be available from competing acquirers and a role in management.

Petitioners rely on the Dutcher appraisal to establish that they contributed property worth more that any benefits received in return.[32] Petitioners' position is that they transferred property with a value in excess of what they received back from SMF because the Dutcher appraisal estimated the value of their intangible assets at $2,515,255,[33] whereas they received back from SMF only a $1,156,733 payment in the aggregate. There are a number of problems in the Dutcher appraisal's estimate of the fair market value of SWMG's intangible assets and each petitioner's allocable share thereof.[34] However, even if it is assumed for argument's sake

_____

[32] Although petitioners used the Houlihan appraisal, coupled with Dr. Levin's allocation formula, for purposes of claiming on their returns the deductions at issue, they abandoned the Houlihan appraisal for purposes of trial and rely instead on the Dutcher appraisal, prepared for them after respondent commenced examinations of the returns.

[33] The Dutcher appraisal treats as the value of each petitioner's intangible assets an allocable share of the value of the intangible assets of SWMG, a medical group petitioners formed simultaneously with the consummation of the transaction with SMF, as required by the terms of the transaction. Respondent argues that because SWMG did not exist before the transaction, petitioners could not have transferred any portion of SWMG's intangible value to SMF as part of the transaction. We find it unnecessary to resolve this issue for purposes of deciding whether petitioners are entitled to the charitable contribution deductions claimed.

[34] Some of the more salient problems with the Dutcher appraisal include:

(continued...)

---

[34](...continued)

(1) There is no allocation of any value to the professional goodwill of the SWMG physicians.  Mr. Dutcher distinguishes, in the case of the goodwill of a professional practice, between "practice" goodwill and "professional" goodwill, the former attributable to characteristics of the practice entity such as patient records, provider contracts, and workforce in place; and the latter attributable to the personal attributes of the individual practitioner, such as charisma, skill, and reputation. Mr. Dutcher further acknowledges that professional goodwill is not transferable.  The intangible asset value attributed by Mr. Dutcher to SWMG was derived to a substantial degree from the discounted present value of the distributable earnings stream that would be generated by the SWMG physicians in the 5 years after the affiliation with SMF.  (That is, Mr. Dutcher treated the value of SWMG's intangible assets as equal to the present value of its future distributable earnings, less implied working capital and tangible assets.)  Yet those distributable earnings were undoubtedly generated in part by patients who continued to see a physician because of that physician's charisma, skill, and/or reputation--his or her professional goodwill.  Several petitioners testified that they understood the goodwill that they transferred to SMF to consist of the foregoing elements.  We believe that some portion of the earnings from which Mr. Dutcher derived his intangible value estimate were generated as a result of professional goodwill.  However, Mr. Dutcher made no adjustment to his intangible value estimate to account for any portion attributable to the professional goodwill that he concedes is nontransferable.  To that extent, his estimate of value of the intangible assets transferred by the SWMG physicians to SMF is inflated and unreliable.

(2) There is no adjustment for the fact that the SWMG physicians were not required to execute noncompete agreements. Mr. Dutcher treated each SWMG physician as transferring an allocable share of SWMG's intangibles, including goodwill, which was not treated as diminished in any way by the physicians' not having executed noncompete agreements with respect to SWMG or SMF.  However, in Norwalk v. Commissioner, T.C. Memo. 1998-279, we found that there is no transferable or salable goodwill where a company's business depends on its employees' personal relationships with clients and the employees have not provided covenants not to compete.  We acknowledged, distinguishing Schilbach v. Commissioner, T.C. Memo. 1991-556, that some of the goodwill of a medical practice is inherent in the operating

(continued...)

that each petitioner transferred intangible assets with some value

to SMF, petitioners would still have failed to show that the value

of what they transferred exceeded the value of what they received

in return.  As previously outlined, the consideration petitioners

---

[34](...continued)
entity.  Norwalk v. Commissioner, supra.  We also believe that,
under the willing buyer/willing seller standard of fair market
value enunciated in Rev. Proc. 59-60, 1959-1 C.B. 237, to which
Mr. Dutcher purportedly adhered, a willing buyer of SWMG on the
transaction date would have insisted on a significant discount
with respect to the value of the entity's intangible assets,
precisely on account of the absence of noncompete agreements from
the SWMG physicians.  Indeed, the SWMG physicians not only did
not execute noncompete agreements; they had the benefit of the
"free to compete" provision in the PSA which facilitated their
reclaiming their patients in the event they decided to cease
working for SWMG/SMF.  Mr. Dutcher's failure to account for the
risk to his estimated 5-year stream of earnings posed by SWMG
physicians' departing with their patients is contrary to well-
established valuation principles and common sense, and results in
an inflated value for the SWMG physicians' goodwill.

(3) The Dutcher appraisal adopts the formula devised by Dr.
Levin, a nonexpert, for allocating the purported value of SWMG's
intangible assets among the SWMG physicians, without providing
any reasons or analysis to support or justify that choice.  See
Mid-State Fertilizer Co. v. Exch. Natl. Bank, 877 F.2d 1333, 1340
(7th Cir. 1989); Estate of Jann v. Commissioner, T.C. Memo. 1990-
333.  To the extent petitioners may not be relying on the Dutcher
appraisal to support the allocation formula used, the allocation
underlying the claimed charitable contribution deductions is not
the product of expert appraisal and should be rejected on that
account.

(4) The Dutcher appraisal takes no account of the $35,000
"Physician Access Bonus" payable to each SWMG physician over the
initial 2 years of the affiliation.  Ignoring these payments when
computing distributable earnings that SWMG would generate results
in a overstatement of those earnings and a corresponding
overstatement of the value of SWMG's intangible assets (since,
under Mr. Dutcher's analysis, intangible asset value equals
present value of future distributable earnings, less tangible
assets and implied working capital).

received was not confined to the cash payment for their tangible assets. They in addition received a package of valuable benefits (above-median compensation, $35,000 "Physician Access Bonuses", working conditions they preferred, etc.) that were not merely incidental or akin to the benefits that inure to the general public as a result of a charitable transfer. See, e.g., Ottawa Silica Co. v. United States, 699 F.2d 1124 (Fed. Cir. 1983); Singer Co. v. United States, 196 Ct. Cl. 90, 449 F.2d 413 (1971). Concededly, some elements of the consideration petitioners received may have been difficult to quantify, but this does not mean these benefits can be disregarded in determining whether a quid pro quo existed that defeats donative intent. See, e.g., Transamerica Corp. v. United States, 902 F.2d 1540 (Fed. Cir. 1990) (donor-taxpayer's receipt back from donee of commercial access rights to donated motion picture film negatives defeats charitable deduction for value of negatives transferred); Singer Co. v. United States, supra (benefit of possible increase in future customers defeats charitable deduction for the value of discounts given to public schools purchasing taxpayer's sewing machines).

Petitioners argue that any consideration they purportedly received in the transaction representing the "value of their post-contribution employment relationship" with SMF must be disregarded because "that value is already taken into consideration in the

valuation process."  In petitioners' view, because the Dutcher appraisal computed the value of petitioners' intangible assets as being essentially the discounted present value of SWMG's "future distributable earnings" (less the value of tangible assets and an amount for implied working capital), and those future earnings were net of physician compensation expense and all other operational expenses, the amount claimed as a contribution for intangible assets should not be offset by physician salaries or any other benefit petitioners received in connection with their providing services to SMF.  The "value of the physicians' future salaries is already netted out of the value of the contribution", petitioners argue.

We disagree.  First, we do not believe the Dutcher appraisal fully accounts for petitioners' compensation from SMF.  Presumably because SWMG was newly formed and there existed no historical data on its physician compensation expense, Mr. Dutcher assumed when computing future distributable earnings that SWMG's physician compensation expense (computed as a percentage of revenue) would be equal to the median physician compensation expense for the medical specialties comprising SWMG, or 45.18 percent of revenue. In fact, SMF agreed to pay compensation to the SWMG physicians of at least 47 to 55.75 percent of revenue.  Moreover, because Mr. Dutcher treated SWMG's physician compensation expense as equal to the 45.18 percent median, his computation of physician

compensation expense takes no account whatsoever of the $35,000
"Physician Access Bonus" that each SWMG physician received.  More
fundamentally, the Dutcher appraisal takes no account of the
various contractual rights and other intangible benefits that
petitioners and the other SWMG physicians sought and obtained in
the transaction with SMF, such as avoiding signing noncompete
agreements and obtaining preferred working conditions.  Because it
does not fully account for the benefits that petitioners received
in the transaction with SMF, the Dutcher appraisal does not
establish that petitioners contributed property to SMF that
exceeded the values of the benefits they received in return.[35]

The quid pro quo nature of the transfer of petitioners'
medical practices (including both the tangible and intangible
assets) in exchange for the package of cash and contractual rights

---

[35] Undoubtedly, some portion of the compensation and
benefits provided to the SWMG physicians in connection with their
posttransaction employment (through SWMG) with SMF is
attributable to the posttransaction services performed.  However,
petitioners have not demonstrated what portion is attributable to
the services they provided, such as by showing what the fair
market values of those services were.  The fair market values of
the services petitioners provided to SMF might be shown, for
example, by a comparison to the compensation paid to similarly
experienced physician-employees of an integrated delivery system
health care provider where the physician-employees had not
transferred existing medical practices to the employer.  Whether
such an arrangement would have exhibited compensation comparable
to petitioners' in terms of salaries, initial $35,000 bonuses, no
requirements to execute noncompete agreements, etc. is a matter
of speculation on this record.  Although Mr. Dutcher stated in
his appraisal that "it is my opinion the physician compensation
offered SWMG shareholders by Sutter had no market value beyond
the value of their professional medical services", there is no
data or analysis to support this conclusion.

that they received from SMF is also demonstrated by petitioners' rejection of the proposed transaction with Foundation (wherein they would have sold their practices to, and entered into an agreement to provide future services for, Foundation). Petitioners make much of the fact that Foundation, as a for-profit entity, was willing to pay substantial sums for petitioners' intangible assets because it was not constrained by the Federal proscriptions on such payments applicable to nonprofit, tax-exempt entities. But when petitioners were offered the opportunity to affiliate with Foundation (and receive an outright cash payment for their intangibles), they collectively rejected the prospect in favor of an acquirer that offered them working conditions they preferred, greater economic security through multiple sources of payment, a "free to compete" provision whereby any of them could essentially "unwind" the transaction and retrieve his or her patients if he or she desired to terminate the relationship with the acquirer, a role in management, and other intangible benefits that were negotiated between the SWMG physicians and SMF. Viewed in this light, it is apparent that the intangible benefits that petitioners received in the transaction with SMF were of substantial value to them. Petitioners spurned a cash payment for their medical practice intangibles in order to obtain these benefits in a different transaction. On this record, petitioners have not shown that the value of what they received in the

transaction with SMF was less than the value of what they transferred.  Thus they have not shown that the transfers of the intangible assets of their medical practices were without adequate consideration.  "The sine qua non of a charitable contribution is a transfer of money or property without adequate consideration." United States v. Am. Bar Endowment, 477 U.S. at 118; see also Transamerica Corp. v. United States, 902 F.2d at 1545-1546.[36]

B.  Respondent's Duty of Consistency

Petitioners also argue that the Commissioner has previously taken the position in rulings and other guidance covering similar transfers of group medical practice assets to nonprofit health care organizations that charitable contribution deductions for the transferors are appropriate and that respondent is therefore bound to follow that position in this case.  Petitioners cite the Friendly Hills determination letter and several of the Commissioner's annual Exempt Organizations Continuing Professional Education Technical Instruction Program manuals (instruction manuals) wherein the Commissioner indicated that a section 501(c)(3) organization could acquire the assets of a group medical practice through purchase or through a charitable donation by the group's physicians without jeopardizing the acquiring

_____

[36] Because we conclude that petitioners have failed to demonstrate that they transferred property worth more than what they received in return, we do not decide whether the claimed deductions should be denied because petitioners failed to comply with the requirements of sec. 1.170A-13, Income Tax Regs., and sec. 170(f)(8).

organization's tax-exempt status.  Since in the foregoing materials the Commissioner specifically contemplated a charitable contribution under section 170 and did not put it into issue or otherwise treat the matter as problematic, petitioners argue that the Commissioner has thereby indicated that donative intent in such transactions is presumed or is not a significant issue. Thus, petitioners conclude, by challenging petitioners' donative intent in a virtually identical transaction, respondent has violated his duty of consistency between his rulings and litigation position, contrary to our holding in Rauenhorst v. Commissioner, 119 T.C. 157 (2002).

Respondent argues that:  (1) The transaction considered in the Friendly Hills determination letter is materially distinguishable from the transaction in this case, (2) neither that letter nor the instruction manuals address the section 170 deduction issue, and (3) in any event, neither may be cited as precedent.  Therefore, respondent considers Rauenhorst to be inapposite.

We agree with respondent that, under Rauenhorst, neither the Friendly Hills determination letter nor the instruction manuals limit the position respondent may take in these cases.

The Friendly Hills determination letter did concern the acquisition of the assets (including "intangible assets") of a physicians' medical group by a nonprofit medical foundation in

which it was represented that the foundation would pay $110 million and the transferring physicians would "make charitable donations in an aggregate amount, and deduct from their income taxes proportionate amounts of that aggregate, which, when combined with the [$110 million] cash purchase price, will not total more than $125 million." However, the issue addressed in the determination letter was the tax-exempt status of the acquiring foundation (which was granted). The determination letter thus had no occasion to consider the issue of donative intent (much less rule on deductibility), observing only that "Donors may deduct contributions to you as provided in section 170 of the Code." Respondent also argues, and we agree, that there are significant distinctions between the facts as represented in the Friendly Hills determination letter and petitioners' circumstances. In the Friendly Hills transaction, unlike the cases at issue, the transferring physicians had executed noncompete agreements, there were no signing bonuses (i.e., "Physician Access Bonuses"), and the donations represented approximately 12 percent of the transfer ($15 million/$125 million), whereas petitioners claim that approximately 61.5 percent of the "business enterprise value" of SWMG was given away ($2,515,255 intangibles/$4,088,450 "business enterprise value"[37]).

---

[37] The figures above are taken from the Dutcher appraisal's estimate of the intangible assets purportedly contributed by the SWMG physicians, on which petitioners currently rely. On the
(continued...)

Most importantly, the Friendly Hills determination letter, as petitioners concede on brief, pursuant to section 6110(j)(3)[38] "may not be used or cited as precedent."

Similarly, although the instruction manuals generally describe methods by which an integrated delivery system may be formed, including acquisition of medical group assets "by donation, fair market value purchase, lease, license, stock transfer or a combination thereof" (emphasis added), those publications also focus on mergers of nonprofit hospitals or medical foundations with physician groups from the standpoint of the former entities' qualification for tax-exempt status under section 501(c)(3).  Similar to the Friendly Hills determination letter, the instruction manuals do not specifically address the charitable contribution issue, which accounts for their failure to emphasize the requirement of donative intent in connection with any "donation" of assets by the physicians.  Moreover, the introduction to each annual edition of the instruction manuals contains the following statement:  "The text is for educational purposes only.  It is not authority, and may not be cited as such."

---

[37](...continued)
basis of the Houlihan appraisal used by petitioners for purposes of filing their 1994 returns (but now abandoned by them), the claimed donations would constitute approximately 41 percent of the value of SWMG ($1,632,377 intangibles/$4 million business enterprise value).

[38] Currently codified as sec. 6110(k)(3).

In Rauenhorst v. Commissioner, supra at 183, we held that the Commissioner may not take a litigating position contrary to his own revenue rulings, which constitute public guidance.  Neither the Friendly Hills determination letter nor the instruction manuals are revenue rulings or are intended by the Commissioner to constitute public guidance.  Therefore, even if they could be viewed as supporting petitioners' claim that the Commissioner has minimized the significance of donative intent in some transfers of medical practice assets, since the cited materials are not revenue rulings or similar public guidance they do not, under Rauenhurst, constrain the position that respondent may take in these cases.

II.  Issues Involving Individual Petitioners

    A.  The Kennedys

        1.  Background

Respondent bases his $3,760 increase in Dr. Kennedy's 1994 Schedule C gross receipts on three documents, all of which are stipulated exhibits:  (1) The examining agent's summary of certain bank deposits of Dr. Kennedy's, totaling $23,797.26, that is described as a schedule of Dr. Kennedy's 1994 accounts receivable after sale of practice (agent's report); (2) a letter from Dr. Kennedy to his accountant dated February 27, 1994,[39] (sic) (letter), in which he advises his accountant:  "I have collected

---

[39]Given its contents, the letter was necessarily drafted in 1995.

$23,037.00 for November and December and I have included that on my business income for 1994"; and (3) Dr. Kennedy's profit and loss statement for October, 1994 (P & L statement), which shows total year-to-date patient fees, as of October 31, 1994, of $176,002.44. On the basis of these documents, respondent posits that Dr. Kennedy's total reported 1994 gross receipts from patient fees (earned before he became an employee of SWMG as of November 1, 1994) were understated by $3,760. Therefore, they must be increased from $195,709 as reported to $199,469 as determined after examination. The Kennedys offer no documentary rebuttal. They merely state, on brief, that the adjustment is 9 years old, the records are "impossible to trace", and it is "Dr. Kennedy's recollection" that the $195,709 reported on his return "is the accurate dollar amount that he received as gross sales for his medical practice."

### 2. Discussion

Although the stipulated exhibits (in particular, the letter) generally support respondent's determination, his numbers do not quite add up. Whether the $176,002 representing Dr. Kennedy's 1994 gross receipts through October 31, 1994, is increased by $23,797 (per the agent's report) or $23,037 (per the letter), the result differs slightly from the total 1994 Schedule C gross receipts of $199,469 respondent determined. On cross-examination

by respondent's counsel, Dr. Kennedy testified as follows

regarding the contents of the letter and the P & L statement:

> Q    Would you look at Exhibit 629-J please?  Do you
>       recognize this?
> A    I think it's a letter I wrote to my accountant it
>       looks like, at least the first of it.
> Q    Okay.  And then there's a lengthy paragraph on the
>       bottom of the page, which you know, as we get two-thirds
>       of the way down it states, "I have collected 23,037 for
>       November and December."  Do you see that?
> A    Yes.
> Q    Okay.  And then would you look at Exhibit 631-J
>       please?
> A    Yes.
> Q    Which is your profit and loss statement through the
>       end of October '94?
> A    Um-hmm.
> Q    So it says, "Income Patient Fees Year To Date $176,002."
>       That would have been what you collected through that
>       point in time?
> A    (No audible response).
> Q    So then if we add the 176,000 to the 23,000, we get
>       about 199,000.  So that would have been your income for
>       the year?
> A    I suppose.

We accept the foregoing exchange as a concession by Dr.

Kennedy that his November and December 1994 collections totaled

at least $23,000 and a concession by respondent that Dr. Kennedy's

total 1994 Schedule C gross receipts totaled $199,000, not

$199,469, an increase of $3,291 over the $195,709 Dr. Kennedy

reported.  Therefore, we sustain respondent's proposed increase in

Dr. Kennedy's 1994 Schedule C income to the extent of $3,291.

B.    The Derbys

1.    Background

There appears to be no dispute between the parties that there is a $3,665 discrepancy between the amount reported as Schedule K-1 nonpassive income from Dr. Derby's wholly owned professional (S) corporation, Charles A. Derby, M.D., Inc. (the corporation), on the Derbys' 1994 Schedule E ($4,209) and the amount of ordinary income actually listed on the corporation's 1994 Schedule K-1 ($7,874). During the trial, Dr. Derby testified as follows regarding the discrepancy:

> At the close of the year, I had -- I was in the process of dissolving the "S" corporation, and one of the reconciliations that was necessary was there were a -- I had a petty cash drawer and in it there were receipts. And there was one principal receipt that was for the -- my computer that I had purchased earlier in the year. It was around 2,600 -- 2,700. And then around a thousand dollars of petty cash receipts that were money from my own personal pocket that had been utilized by the "S" corporation, and in dissolving the "S" corporation, I think that's where the discrepancy.
> Now, I tried to get in touch with my accountant, Mr. Kramer, to go over this with him, and I just wasn't able to do that, and I don't have specific receipts for this at this particular time, but that's my best recollection of the -- what the discrepancy was.

Dr. Derby further testified that the corporation reimbursed him for the computer and the other items at the time of its dissolution in late 1994. Thus, it is Dr. Derby's position that he, in effect, made a constructive loan to the corporation of the amount in question by personally incurring expenses deemed to be incurred by the corporation with the constructively borrowed funds (which were reimbursed to Dr. Derby upon dissolution of the

corporation), and that the corporation's 1994 return mistakenly overstated the corporation's net ordinary income by the amount of those deductible expenses.  Respondent simply points to the discrepancy between the two returns and argues that Dr. Derby understated his 1994 ordinary income from the corporation by $3,665.

### 2.  Discussion

The dispute between the Derbys and respondent raises three issues:  (1) A factual issue as to whether Dr. Derby incurred the expenses in question in 1994, (2) whether the expenses were currently deductible business expenses under section 162(a), and (3) assuming he did incur the expenses and that they were currently deductible, whether they resulted in a constructive loan and corporate purchase of the items in question or a capital contribution of the purchased items by Dr. Derby to the corporation.

At trial, Dr. Derby admitted that he had no "specific receipts" that would substantiate the alleged expenditures or their deductibility and that his oral testimony constituted his "best recollection of * * * what the discrepancy was."  Assuming arguendo that the Derbys are not required to satisfy the substantiation requirements of section 274(d) in support of the alleged expenditures, they were nonetheless required to maintain records sufficient to substantiate the claimed deductions, in this

case, on behalf of the corporation. See sec. 6001; sec. 1.6001-1(a), Income Tax Regs. Moreover, they have failed to provide even the minimal substantiation that would permit us to estimate the allowable deduction under <u>Cohan v. Commissioner</u>, 39 F.2d 540, 543-544 (2d Cir. 1930). Even under <u>Cohan</u>, there must be sufficient evidence in the record to provide a basis upon which an estimate may be made. <u>Vanicek v. Commissioner</u>, 85 T.C. 731, 742-743 (1985). Here, there is none. By failing to provide any substantiation that would corroborate Dr. Derby's somewhat uncertain testimony, the Derbys have failed to sustain their burden of proof under Rule 142(a) as to either the existence or deductibility of the alleged expenditures.

Moreover, assuming arguendo that Dr. Derby actually incurred the alleged expenditures and that they were of a type that would be currently deductible by the corporation, the evidence does not establish whether Dr. Derby incurred them on behalf of the corporation with an expectation of reimbursement or intended that they constitute a capital contribution to the corporation. Dr. Derby's oral testimony is consistent with either approach.[40] The Derbys' failure to prove the existence of a constructive loan provides an additional basis for respondent's $3,665 adjustment.

---

[40] Although Dr. Derby testified that he was reimbursed by the corporation when the corporation was dissolved, that "reimbursement" distribution is consistent with either a debt repayment or a final cash distribution in connection with the dissolution.

3. Conclusion

The Derbys understated Dr. Derby's 1994 income from the corporation to the extent of $3,665.

III. Penalties

A. Introduction

The notices of deficiency issued to petitioners contain the following explanation for respondent's denial of a charitable contribution deduction for each petitioner's alleged contribution of practice intangibles to SMF:

> The contribution claimed with respect to * * * [SMF] is not allowable because it has not been established that the fair market value of the assets sold exceeded the sales price received by you or that the intangible assets donated had any fair market value.

Based upon petitioners' alleged failure to establish that their intangible assets had any fair market value, respondent alleges, in his answers to the petitions, that "petitioners are liable for the accuracy related penalty under [section] 6662(a) in the amount of 40 [percent] of the deficiency for a gross valuation misstatement under * * * [section] 6662(h), or in the alternative are liable for a penalty in the amount 20 [percent] of the deficiency for a substantial valuation misstatement under * * * section 6662(e)" (sometimes, the overvaluation penalty). Because respondent raises the penalty issue in his answers, the issue constitutes a "new matter" under Rule 142(a), and the burden of proof with respect to that issue is upon respondent. See Rule

142(a); see also <u>Am. Ideal Cleaning Co. v. Commissioner</u>, 30 B.T.A. 529, 531 (1934); <u>Burnett v. Commissioner</u>, T.C. Memo. 2002-181, affd. 67 Fed. Appx. 248 (5th Cir. 2003).

Respondent argues, on the evidence in the record, that "the allegedly donated goodwill had no value to SMF." Therefore, the values petitioners claimed as the bases for their section 170 deductions "were 400 percent or more of the correct value, zero." Respondent further argues that petitioners may not rely upon the "reasonable cause", "good faith" exception of section 6664(c)(1) because: (1) The valuation of their intangible assets transferred to SMF was not "based on a qualified appraisal made by a qualified appraiser" as required by section 6664(c)(2)(A), and (2) petitioners failed to make "a good faith investigation of the value of the contributed property" as required by section 6664(c)(2)(B). See also sec. 1.6664-4(h), Income Tax Regs.[41] Petitioners argue that the advice received from Mr. Grant and his partners and, for several of petitioners, from their own accountants furnished a "reasonable basis" for their charitable contribution deductions and that the seeking of and reliance upon that advice constituted a "good faith investigation of the value of the contributed property" within the meaning of section 6664(c)(2)(B).

---

[41] As applicable in 1994, the regulation was codified as 1.6664-4(e), Income Tax Regs.

B.  Analysis

On brief, respondent specifically acknowledges that, if we deny petitioners' charitable contribution deductions for reasons other than their overvaluation of the transferred intangibles, "the penalty is not applicable", citing Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990), affg. T.C. Memo. 1988-416.

In Gainer, the issue was whether the taxpayer was liable for the overstatement penalty under circumstances in which his depreciation deduction and investment tax credit with respect to an equipment purchase were denied because:  (1) The equipment was not placed in service during the taxable year, (2) the equipment was overvalued, and (3) the promissory note given in connection with the purchase was nonrecourse so that he was not at risk.  We refused to apply the penalty on the ground that the deduction and credit were disallowed because the equipment had not been placed in service during the tax year.  Therefore, the underpayments were not "attributable to" any overstatement of value.[42]  The Court of Appeals for the Ninth Circuit affirmed, reasoning as follows:

> Even if Gainer had correctly valued the container, the
> underpayment of tax would be the same because the
> container was not placed in service.  Thus, Gainer's
> actual tax liability, after adjusting for failure to
> place the container in service, was no different from

---

[42] Sec. 6662(b)(3), like its predecessor provision (sec. 6659) considered in Gainer, imposes an addition to tax on underpayments "attributable to" any "substantial valuation misstatement" (referred to, in sec. 6659, as "a valuation overstatement").

his liability after adjusting for any overvaluation.
[Id. at 228.]

The Court stated that "no * * * [overvaluation] penalty * * * [may be imposed] when there is some other ground for disallowing the entire portion of a deduction that otherwise might be disallowed for overvaluation." Id.; see also Scoville v. Commissioner, 108 F.3d 1386 (9th Cir. 1997), affg. in part and revg. in part without published opinion T.C. Memo. 1995-376; Todd v. Commissioner, 862 F.2d 540, 543 (5th Cir. 1988), affg. 89 T.C. 912 (1987).

We have denied petitioners' charitable contribution deductions, in their entirety, on the ground that petitioners received a commensurate quid pro quo. Therefore, under Gainer, because there is a separate, independent ground for disallowing those deductions, the overvaluation penalty may not be imposed against petitioners. See also 885 Inv. Co. v. Commissioner, 95 T.C. 156, 163 (1990).[43]

C. Conclusion

Petitioners are not liable for either a 40-percent or 20-percent addition to tax under section 6662.

_____

[43]In light of our conclusion that the overvaluation penalty may not be imposed, we need not address whether petitioners had "reasonable cause" with the meaning of sec. 6664(c).

To reflect the foregoing,

<u>Decisions will be entered

under Rule 155.</u>